**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FELIPE DE JESUS SALMERON,<br><br>     Plaintiff,<br><br>   v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social<br>Security,<br><br>     Defendant. | Case No. CV 17-3927-JPR<br><br>**MEMORANDUM DISPOSITION AND ORDER<br>AFFIRMING COMMISSIONER** |

**I. PROCEEDINGS**

  Plaintiff seeks review of the Commissioner's final decision denying his application for supplemental security income benefits ("SSI"). The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed March 2, 2018, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is affirmed.

**II. BACKGROUND**

  Plaintiff was born in 1966. (Administrative Record ("AR") 126, 421.) He has a GED and received some postsecondary

education outside the United States (AR 69, 461); he last worked as a "housekeeper" at a hospital and as a "laborer" for a film-materials business (AR 462, 468).

On October 21, 1997, Plaintiff was found disabled as of July 27 of that year from injuries from an assault. (AR 119, 461.) Plaintiff's medical condition improved, and on July 26, 2007, an Administrative Law Judge found him no longer disabled as of June 1, 2005. (AR 119-26.)[1]

On March 22, 2012,[2] Plaintiff applied for SSI, alleging that he had been disabled since July 1997 because of "[d]epression, anxiety, diabetes, seizures, [h]igh [c]holesterol, [and] arthritis."[3] (AR 422.) After his application was denied initially (AR 141) and on reconsideration (AR 157), he requested a hearing before an ALJ (AR 212-14). A hearing was held on July 25, 2013, at which Plaintiff, who was represented by counsel and assisted by an interpreter, testified, as did a vocational expert. (AR 81-113.) In a written decision issued September 11, 2013, the ALJ found Plaintiff not disabled. (AR 172-82.) Plaintiff sought Appeals Council review (AR 265-66), and on

[1] On March 28, 2008, the Appeals Council vacated and remanded that decision for reasons not disclosed in the record. (AR 189.) But Plaintiff failed to appear at two scheduled remand hearings, and the ALJ issued an abandonment dismissal on March 18, 2009, leaving in place the 2006 denial on reconsideration. (AR 164-65, 189.)

[2] Plaintiff's application is date-stamped March 22, 2012 (AR 421), but the SSA later assigned an application date of March 31, 2012 (see, e.g., AR 16, 132, 172), for reasons that are not readily apparent.

[3] Plaintiff subsequently amended his alleged onset date to his application date, March 2012. (See AR 36-37.)

2

January 7, 2015, the Appeals Council remanded the matter for further action and a new decision because the ALJ had incorrectly applied Chavez v. Bowen, 844 F.2d 691, 694 (9th Cir. 1988) (previous ALJ or Appeals Council disability determinations given preclusive effect absent showing of changed circumstances), and had not evaluated the opinion of one of the consulting examiners. (See AR 188-90; see also AR 172-82 (ALJ decision).)

A different ALJ presided over the remand proceedings, which comprised a September 2, 2015 initial hearing (AR 46-80) and a September 7, 2016 supplemental hearing (AR 34-45). Plaintiff, who was represented by counsel and assisted by an interpreter, testified at the first hearing. (AR 68-77.) Medical expert Dr. Tracy Gordy, a psychiatrist (see AR 1182), also testified on the first day (AR 52-68), as did a vocational expert (AR 77-80). The ALJ continued the hearing for Plaintiff to undergo a consulting psychological exam, which he did on October 2, 2015. (AR 16, 1311-19.)

Plaintiff, an interpreter, and his counsel were present at the supplemental hearing nearly a year later, at which medical expert Dr. William Cohen, a psychiatrist (AR 1353), and a vocational expert testified (AR 34-45). In a written decision issued September 26, 2016, the ALJ found Plaintiff not disabled. (AR 16-27.) Plaintiff requested review from the Appeals Council (AR 7-9), which denied it on March 22, 2017 (AR 1-6). This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and

3

decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R.

4

§ 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied. § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[4] to perform his past work; if so, he is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of

_____

[4] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. <u>Laborin v. Berryhill</u>, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

proving he is unable to perform past relevant work. <u>Drouin</u>, 966

F.2d at 1257. If the claimant meets that burden, a prima facie

case of disability is established. <u>Id.</u>

If that happens or if the claimant has no past relevant

work, the Commissioner then bears the burden of establishing that

the claimant is not disabled because he can perform other

substantial gainful work available in the national economy.

§ 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257. That determination

comprises the fifth and final step in the sequential analysis.

§ 416.920(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5.

     B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since March 31, 2012, the

application date. (AR 19.) At step two, she concluded that

Plaintiff had the severe impairments of "adjustment disorder with

depression," "diabetes mellitus with neuropathy," and "history of

seizures." (<u>Id.</u>) She found that Plaintiff did not have a

"medically determinable cognitive disorder." (<u>Id.</u>) At step

three, she determined that Plaintiff's impairments did not meet

or equal a listing, expressly considering listings 9.00 (for

diabetes), 11.03 (for nonconvulsive epilepsy), and 12.04 (for

affective disorders). (AR 19-20.)

At step four, the ALJ found that Plaintiff had the RFC to

perform light work except that he "should avoid hazards such as

ladders, heights and moving machinery" and was "limited to

occasional interaction with the public, supervisors and

coworkers." (AR 21.) She further noted in his RFC that he was

"literate but not fluent in English." (<u>Id.</u>) Based on the VEs'

testimony, the ALJ concluded that Plaintiff could perform jobs existing in significant numbers in the national economy, including "Cleaner, Housekeeping" (DOT 323.687-014, 1991 WL 672783 (Jan. 1, 2016)), "Marker" (DOT 209.587-034, 1991 WL 671802 (Jan. 1, 2016)), and "Routing Clerk" (DOT 222.687-022, 1991 WL 6712133 (Jan. 1, 2016)). (AR 27.) Thus, she found Plaintiff not disabled. (Id.)

## V. DISCUSSION[5]

Plaintiff argues that the ALJ erred in assessing his cognitive disorder as not severe (see J. Stip. at 4-12) and in failing to properly consider his subjective symptom testimony (id. at 17-19), the latter in part because of personal bias against him (see id. at 19-26, 29-30). For the reasons discussed below, the ALJ did not err and remand is not warranted.

### A. The ALJ Properly Assessed Plaintiff's Cognitive Impairments as Not Severe

Plaintiff contends that the ALJ "failed to find a severe cognitive disorder" because she improperly rejected the opinion of consulting psychiatrist Amir Faghfoory that Plaintiff's

---

[5] In Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), the Supreme Court recently held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause. To the extent Lucia applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during his administrative proceedings. (See, e.g., AR 34-80; J. Stip. at 4-12, 17-26, 29-30); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council); see also generally Davidson v. Comm'r of Soc. Sec., No. 2:16-cv-00102, 2018 WL 4680327 (M.D. Tenn Sept. 28, 2018) (rejecting Lucia challenge because plaintiff did not raise it during administrative proceedings).

ability to do any work-related task would likely be compromised by "head trauma" and "memory issues" and "failed to address" the October 21, 1997, June 1, 2005, and September 11, 2013 ALJ decisions that ostensibly assessed a severe cognitive disorder. (See J. Stip. at 4-12 (citing AR 25, 980).)  For the reasons discussed below, the ALJ did not err and Plaintiff's argument is without merit.  Moreover, any error would have been harmless.

1. <u>Applicable law</u>

The step-two inquiry is "a de minimis screening device to dispose of groundless claims." <u>Smolen v. Chater</u>, 80 F.3d 1273, 1290 (9th Cir. 1996).  The claimant has the burden to show that he has one or more "severe" medically determinable impairments that can be expected to result in death or last for a continuous period of at least 12 months, as demonstrated by evidence in the form of signs, symptoms, or laboratory findings.  <u>See</u> §§ 416.905, 416.920(a)(4)(ii), 416.921; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987); <u>Ukolov v. Barnhart</u>, 420 F.3d 1002, 1004-05 (9th Cir. 2005).  A medically determinable impairment is "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."[6]  § 416.920(c); <u>see also</u> § 416.921(a).  "An impairment or combination of impairments may be found 'not severe <u>only if</u> the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'"  <u>Webb v. Barnhart</u>, 433 F.3d 683,

_____

[6]  "Basic work activities" include, among other things, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling" and "[c]apacities for seeing, hearing, and speaking."  § 416.921(b); <u>accord Yuckert</u>, 482 U.S. at 141.

686 (9th Cir. 2005) (quoting <u>Smolen</u>, 80 F.3d at 1290 (emphasis added)). A court must determine whether substantial evidence in the record supported the ALJ's finding that a particular impairment was not severe. <u>Davenport v. Colvin</u>, 608 F. App'x 480, 481 (9th Cir. 2015) (citing <u>Webb</u>, 433 F.3d at 687); <u>see also</u> <u>Kent v. Astrue</u>, 335 F. App'x 673, 674 (9th Cir. 2009) (same).

The ALJ may disregard a physician's opinion regardless of whether it is contradicted. <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989); <u>see also</u> <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008). When it is contradicted, the ALJ must provide only a "specific and legitimate" reason for discounting it. <u>Carmickle</u>, 533 F.3d at 1164 (citing <u>Lester</u>, 81 F.3d at 830-31). The weight given a treating or examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. § 416.927(c)(1)-(6).

The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

2. <u>Relevant medical background</u>

On September 27, 1997, in connection with his 1997 application for SSI benefits, Plaintiff underwent a consulting exam by psychologist Roger A. Izzi. (AR 571-75.) He had been released from the hospital only on September 9 of that year following extensive treatment, including brain surgery, for injuries he suffered in a July 1997 assault. (AR 571.) At the

visit with Dr. Izzi, he "appeared somewhat aphasic" but was "alert," had "no problems in comprehension," and "responded to questions appropriately." (AR 572.) He "was oriented to time, place, person, and situation," and his "thought process" was "without looseness of association." (AR 573.) Dr. Izzi administered the Wechsler Adult Intelligence Scale - Revised[7] and assessed his IQ at 72, indicating "[b]orderline" cognitive functioning. (Id.) He performed normally on tests of short-term memory and visual integration except that he drew "tremulous lines" that were "consistent with the presence of brain dysfunction" but did not indicate "gross brain dysfunction." (AR 573-74.) He showed "moderate" impairment on the Wechsler Trail-Making Test, parts A and B.[8] (AR 574.) Dr. Izzi diagnosed him with "Cognitive Disorder N[ot] O[therwise] S[pecified]" and "[b]orderline [i]ntellectual [f]unctioning" and noted his "[s]tatus post brain surgery." (Id.) He opined that Plaintiff would have "no difficulty maintaining adequate attention to

---

[7] The Wechsler Adult Intelligence Scale measures intelligence in adults and older adolescents. See The Wechsler Adult Intelligence Scale, VeryWellMind, https:// www.verywellmind.com/the-wechsler-adult-intelligence-scale-2795283 (last updated Dec. 23, 2017). It provides scores of an examinee's verbal comprehension, perceptual reasoning, working memory, and processing speed as well as his overall IQ and an index of his general ability. See id. The WAIS has existed in four different versions: the original WAIS (1955), the WAIS-R (1981), the WAIS-III (1997), and the WAIS-IV (2008). See id.

[8] The Trail-Making Test is a timed test used to assess cognition and screen for dementia. See Administration, Scoring and Interpretation of the Trail Making Test, VeryWellHealth, https://www.verywellhealth.com/dementia-screening-tool-the-trail-making-test-98624 (last updated Mar. 23, 2018).

follow simple one-part instructions," could "perform[] simple and
repetitive type tasks," was "not likely to have any problems
getting along with peers or supervisors in a work-like setting,"
and could respond appropriately to "usual work session situations
regarding attendance and safety issues" and "deal[] with changes
in a routine work setting." (AR 574.) He found that Plaintiff's
"neuropsychological deficits, if any, are very subtl[e]" and
might be an artifact of "the recency of the injury." (Id.)

On May 19, 2005, an unnamed consulting examiner performed a
psychological evaluation on Plaintiff. (AR 562-66.) Plaintiff
reported being "depressed" and taking Paxil.[9] (AR 562-63.) He
was receiving SSI benefits, which he managed himself, and was
studying English as a second language. (AR 563.) He was
"generally oriented to person, time, place, and purpose," and his
thoughts were "organized in a concrete manner." (AR 564.) The
examiner found him to have "mildly diminished" short-term memory,
attention, and concentration. (Id.) He scored "within the
impairment range" on Part A of the Trail-Making test, and his
WAIS-III results yielded an IQ of 75. (AR 564-65.)

The examiner diagnosed Plaintiff with "[b]orderline
intellectual functioning" (AR 564, 566) and opined that he "would
be able to understand, remember, and carry out short, simplistic
instructions without difficulty" and "make simplistic work

---

[9] Paxil is a brand name for paroxetine, a selective-serotonin-reuptake inhibitor used to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disorders, and posttraumatic stress disorder. See Paxil, WebMD, https://www.webmd.com/drugs/2/drug-6968-6095/paxil-oral/paroxetine-suspension-oral/details (last visited Oct. 10, 2018).

related decisions without special supervision" (AR 566). The examiner assessed mild limitations in Plaintiff's ability to "understand, remember, and carry out detailed instructions," "handle everyday work stressors within the work environment," and "interact appropriately with supervisors, coworkers, and peers." (Id.) The examiner did not diagnose any cognitive disorder. (Id.)

On May 22, 2011, psychiatrist Dr. Thaworn Rathana-Nakintara met with Plaintiff for a consulting exam. (AR 848-52.) He complained of depression and was taking paroxetine for it; he was also taking buspirone,[10] presumably for anxiety. (AR 848-49.) His "speech was spontaneous, fluent, coherent and relevant with normal rate and rhythm," and his "thought processes were linear and goal-directed." (AR 850.) He was able to spell "world" forward and backward and "do serial sevens subtraction fast and accurately." (Id.) He could engage in abstract thinking and "was able to name President Obama and the three former presidents." (Id.) He reported that his medications were "helping him real well for both anti-anxiety and antidepressant." (Id.) Dr. Rathana-Nakintara diagnosed him with only "Mood Disorder NOS" and assessed no functional limitations. (AR 850-51.) The doctor did not perform an IQ or trail-making test and did not indicate that Plaintiff showed any signs of cognitive impairment. (See AR 848-52.)

---

[10]    Buspirone, also sold under the brand name Buspar, treats anxiety by affecting neurotransmitters in the brain. See Buspirone HCL, WebMD, https://www.webmd.com/drugs/2/drug-8876/buspirone-oral/details (last visited Oct. 10, 2018).

On June 6, 2012, shortly after the start of the revised alleged onset date, Dr. Faghfoory met with Plaintiff for a consulting exam. (AR 977-81.) He complained of various symptoms of depression and anxiety and said he was taking Paxil and buspirone to treat them. (AR 977-78.) He also reported "difficulties with memory," which he attributed to the 1997 assault. (AR 978.) His "speech was spontaneous and fluent," his "thoughts were logically connected with an adequate flow of ideas," and he demonstrated fair insight, good judgment, and good impulse control. (AR 979.) He "was able to spell WORLD forward and backward," "perform[ed] serial sevens successfully," correctly identified the current President, and could interpret abstractions and describe the appropriate response to hypothetical situations. (AR 980.) He was "alert and fully conscious" and "oriented to person, time, place, and situation," and "[h]is attention and immediate recall were intact." (Id.) His "general fund of knowledge was average," but "there appeared to be some memory deficits." (Id.) Dr. Faghfoory did not elaborate on what the deficits were, their severity, or how they would affect Plaintiff's ability to work. (Id.)

Dr. Faghfoory diagnosed Plaintiff with "[m]ood disorder not otherwise specified" and stated that "mood disorder versus cognitive disorder due to . . . head trauma" and "panic disorder" needed to be "rule[d] out" with "neuropsychological testing." (AR 980-81.) He opined that despite Plaintiff's evidently normal activities of daily living and competent handling of his own finances, his "ability to perform any [work-related] task" "appear[ed] to be compromised or likely to be compromised because

13

of his head trauma issues and memory issues." (Id.) Dr. Faghfoory recommended "neuropsychological evaluation" (AR 981; see also AR 980) and opined that Plaintiff would "likely [benefit] from disability [payments] as well" (AR 981). He apparently did not perform any IQ test, memory test, or the Trail-Making test and did not diagnose any cognitive impairment. (See AR 979-81.)

At Plaintiff's September 2, 2015 hearing on remand, medical expert Dr. Gordy testified that the record was insufficient for him to "make a really informed decision" on whether Plaintiff had a cognitive disorder that would affect his ability to work. (AR 55-56; see also generally AR 55-67.) He recommended further testing, including a "Wechsler," a trail-making test, and a Bender-Gestalt[11] test. (AR 64-66.) The ALJ agreed to request those tests in order to develop the record. (AR 67.)

On October 2, 2015, evidently in response to the ALJ's request, Plaintiff again met with consulting examiner Dr. Izzi for a psychological examination. (AR 1311-17.) He reported depression, anxiety, drowsiness from medication side effects, and problems with balance and falling. (AR 1311.) He was taking Buspar and paroxetine for his mental-health issues. (AR 1312.) Dr. Izzi attempted to administer the WAIS-IV test but was unable to obtain valid results, in part "[b]ecause of [Plaintiff's] language and cultural issues" and in part because of "likely"

---

[11] The Bender-Gestalt test assesses possible brain damage by asking subjects to copy geometric designs with pencil and paper. See Bender-Gestalt Test, ScienceDirect, https://www.sciencedirect.com/topics/neuroscience/bender-gestalt-test (last visited Oct. 10, 2018).

"poor effort or poor motivation." (AR 1313.)  He also
administered the Trail-Making Test, parts A and B.  (AR 1313-14.)
Plaintiff's performance on Part A suggested a "moderate degree of
impairment," but "only a mild degree of impairment was suggested
on Part B," the "more difficult section."  (AR 1314.)  Dr. Izzi
did not report administering the Bender-Gestalt test.  (AR 1313.)

Dr. Izzi diagnosed Plaintiff with "[a]djustment [d]isorder
with [m]ixed [a]nxiety and [d]epression."  (AR 1314.)  He did not
diagnose any cognitive impairment and attributed the test results
in part to poor "effort and motivation" and possibly "[e]motional
factors."  (Id.)  He completed a Medical Source Statement in
which he assessed no impairment in Plaintiff's ability to
"[u]nderstand[,] remember[, and] [c]arry out simple instructions"
and "make judgments on simple work-related decisions."  (AR
1315.)  He assessed "mild" limitations in Plaintiff's ability to
understand, remember, and carry out "complex instructions"; make
judgments on "complex" work-related decisions; interact
appropriately with the public, supervisors, and coworkers; and
"[r]espond appropriately to usual work situations and to changes
in a routine work setting."  (AR 1315-16.)  He did not assess any
moderate or marked limitation in any area.  (See AR 1315-17.)

Medical expert Dr. Cohen reviewed the longitudinal evidence
and testified at the supplemental hearing, on September 7, 2016.
(AR 39-41.)  He diagnosed Plaintiff with "an adjustment disorder
with mixed emotional features, primarily depression."  (AR 39.)
He observed that the depression was "potentially reversible with
treatment," but Plaintiff was "not in treatment for [it]" at the
time.  (AR 40.)  Based on Plaintiff's medical records and

15

reported activities of daily living, he opined that "psychiatrically, he doesn't meet a listing." (AR 39-40.) He acknowledged that there was "some indication about borderline intellectual functioning" but felt he "[did] not have enough evidence to say that that[ was] the issue," and he agreed with the ALJ that Plaintiff's limited English fluency might have impacted "some of the information" in his medical records. (AR 40.) Dr. Cohen assessed mild limitations in "concentration, persistence, and pace" and moderate limitation in social functioning. (AR 39; see also AR 40-41.) He advised that Plaintiff have only "occasional contact with the public, supervisors and coworkers." (AR 41.) Plaintiff's counsel declined to question him. (Id.)

       3.   <u>Analysis</u>

          a.  *The ALJ did not err*

The ALJ gave "great weight" to Dr. Cohen's 2016 opinion that insufficient evidence supported Plaintiff's having a "medically determinable cognitive disorder." (AR 19.) She noted that Dr. Cohen, a board-certified psychiatrist and neurologist, had "reviewed the entire record and therefore had the most complete picture of [Plaintiff's] impairments and treatment history," and his assessment was "consistent with the longitudinal record." (AR 24.) She observed that Dr. Izzi's 1997 evaluation and the unnamed provider's 2005 report had found only subtle or borderline cognitive impairments and that "subsequent reports and testing [did] not corroborate these diagnoses." (AR 19; see also

16

AR 574 (Dr. Izzi), 566 (2005 provider).)[12]  She also cited

Plaintiff's normal results on the mental-status exams performed

by Dr. Rathana-Nakintara in 2011 and Dr. Faghfoory in 2012 and

the evidence of malingering Dr. Izzi found in 2015, the most

recent exam, as support for the RFC she assigned Plaintiff.  (AR

23 (citing AR 850, 979-80, 1313-14).)  Substantial evidence in

the record supported the ALJ's determination that any cognitive

impairment did not significantly limit Plaintiff's ability to do

basic work activities.  See Saelee v. Chater, 94 F.3d 520, 521-22

(9th Cir. 1996) (per curiam) (as amended).

The ALJ gave "less weight" to Dr. Faghfoory's opinion that

Plaintiff's "head trauma" and "memory" issues would likely

compromise his ability to perform any work-related task (see AR

25 (citing AR 980)) because that opinion was inconsistent with

Dr. Faghfoory's notes showing normal mental-status exam results

and his observations that Plaintiff could handle his own finances

and activities of daily living, and because Dr. Faghfoory had

examined Plaintiff on only one occasion[13] and had recommended

---

[12]   Neither Dr. Izzi in 1997 nor the 2005 examiner opined
that Plaintiff's cognitive impairments precluded him from
working.  (See AR 566, 574.)  Indeed, Dr. Izzi did not assess any
specific limitations on his ability to work.  (See AR 574.)  The
2005 examiner assessed only "mild" limitation in the areas of
understanding, remembering, and carrying out detailed
instructions, handling everyday work stressors within the work
environment, and interacting appropriately with supervisors,
coworkers, and peers.  (AR 566.)  He assessed no moderate or
marked limitations of any kind.  (Id.)

[13]   Plaintiff contends that this was a "woefully week
basis" to discount Dr. Faghfoory's opinion (J. Stip. at 10), but
the regulations specifically provide that the "[l]ength of the
treatment relationship and the frequency of examination" are
proper factors in determining the weight to be given any

17

further neuropsychological testing (see AR 25 (citing AR 980-81).) That further testing was subsequently conducted by Dr. Izzi, who assessed mild limitations at most and found evidence of malingering. (See AR 1311-18.) Indeed, as Defendant points out (see J. Stip. at 15 (citing AR 980)), Dr. Faghfoory did not actually diagnose Plaintiff with a cognitive disorder.

Internal inconsistency, lack of diagnostic evidence, and contradiction with the remainder of the medical record are specific and legitimate reasons for the ALJ to have given portions of Dr. Faghfoory's opinion less weight. See Burdon v. Colvin, 650 F. App'x 535, 537 (9th Cir. 2016) (citing Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001), and Batson v. Comm'r of Soc. Sec. Admin, 359 F.3d 1190, 1195 (9th Cir. 2004)). Moreover, even had the ALJ afforded more weight to his opinion, that would not have led to a determination that Plaintiff had a severe cognitive disorder because Dr. Faghfoory not only did not diagnose any cognitive disorder but also observed that "[p]sychiatrically [Plaintiff] does not appear to have any symptoms" except for "interrupted sleep" and "anxiety." (AR 981.)

Plaintiff also relies on the 1997, 2005, and 2013 ALJ decisions that purportedly assessed a severe cognitive disorder. (See J. Stip. at 8, 11.) But the 2005 and 2013 decisions nonetheless found him not disabled; in fact, the 2005 decision

particular medical opinion, see § 416.927(c)(2)(i). Further, the ALJ gave great weight to the reviewing doctor despite his having never examined Plaintiff, not because of the lack of a treating relationship; thus, there was no inconsistency in the ALJ's weighing of the doctors' opinions.

determined that Plaintiff had medically improved since the 1997 decision to the extent that he was no longer disabled. (See AR 119-21, 125, 172, 182.) Thus, to the extent he seeks to apply some preclusive effect to those determinations — a proposition for which he cites no authority — it would not work in his favor. See Chavez, 844 F.2d at 694.[14] Moreover, as Plaintiff apparently concedes (see J. Stip. at 8), it is far from clear that the 2005 or 2013 decisions assessed any severe cognitive impairment (see AR 120-21 (as of June 2005 Plaintiff had "medically determinable impairments" of, among others, "cognitive disorder" and "borderline intellectual functioning" but no assessment of severity), 175 (as of 2013 decision Plaintiff had "medically determinable impairments" including "cognitive disorder" and "borderline intellectual functioning" that were "not all . . . severe if considered separately" but were severe "in combination")). The Court is hard-pressed to see how Plaintiff's argument supports reversal.

Further, even if the 2005 and 2013 ALJs had assessed a severe cognitive disorder, a subsequent ALJ is not precluded from considering new medical information and updating or revising a previous determination accordingly, see Alekseyevets v. Colvin, 524 F. App'x 341, 344 (9th Cir. 2013), which, as discussed below,

---

[14] The 2005 decision dates from seven years before the filing date and revised onset date and is therefore not relevant in any event. See § 416.330(a) (relevant period for SSI payments begins on month following protective filing date); see also King v. Berryhill, No. 16-cv-06643-KAW, 2018 WL 1367342, at *6-7 (N.D. Cal. Mar. 16, 2018) (ALJ not required to discuss evidence from years before relevant period because it was "neither significant nor probative" (citation omitted)).

the ALJ did in this case. Plaintiff's reliance on the earlier
determinations is therefore misplaced. Accordingly, the ALJ did
not err in assessing Plaintiff's cognitive impairment as not
severe. See id.; Saelee, 94 F.3d at 522.

       b. *Any error would have been harmless*

       As noted above, the step-two inquiry is "a de minimis
screening device to dispose of groundless claims." Smolen, 80
F.3d at 1290. When a claimant is found to have any severe
impairment, the ALJ is required to consider the functional effect
of all his impairments, both severe and nonsevere. See SSR 96-
8p, 1996 WL 374184, at *5 (July 2, 1996) ("In assessing RFC, the
adjudicator must consider limitations and restrictions imposed by
all of an individual's impairments, even those that are not
'severe.'"). Any step-two error is harmless as long as the ALJ
considered the nonsevere impairments at later steps of the
analysis. See Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007)
(as amended) (any step-two error would be harmless given ALJ's
consideration of nonsevere impairments at step four); Gray v.
Comm'r of Soc. Sec. Admin, 365 F. App'x 60, 61-62 (9th Cir. 2010)
(no reversible error in ALJ's step-two determination that certain
impairments were nonsevere when ALJ found other severe
impairments and considered but discredited nonsevere impairments
at step five); Bickell v. Astrue, 343 F. App'x 275, 278 (9th Cir.
2009) (same).

       The ALJ found Plaintiff to have other severe impairments
(see AR 19) and expressly considered the "entire record" in
assessing his RFC (AR 21), including evidence of his cognitive
function provided by Drs. Izzi, Rathana-Nakintara, and Faghfoory,

20

his treating doctors at Serra Community Medical Clinic, and others (see AR 21-23). She found at step three that Plaintiff had "mild difficulties" in "concentration, persistence[, and] pace," a finding that was evidently based in part on Dr. Faghfoory's exam notes. (AR 21 (citing AR 979).) Thus, the ALJ's determination as to the severity of Plaintiff's mental condition had no effect on her obligation to review and consider all evidence of record, which she did. (See AR 21, 26.)

Moreover, at step four, Plaintiff's RFC accounted for his mental impairments by limiting him to "occasional interaction with the public, supervisors and coworkers" and noting that he is "literate but not fluent [in] English." (AR 21.) The three representative jobs cited by the ALJ are all unskilled. (See AR 27); see also DOT 323.687-014, 1991 WL 672783 (Jan. 1, 2016) ("Cleaner, Housekeeping"); DOT 209.587-034, 1991 WL 671802 (Jan. 1, 2016) ("Marker"); DOT 222.687-022, 1991 WL 672133 (Jan. 1, 2016) ("Routing Clerk"). Accordingly, even had the ALJ erred at step two, any such error would have been harmless because it would not have affected Plaintiff's RFC or, by extension, his disability status. See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008); see also McGarrah v. Colvin, 650 F. App'x 480, 481 (9th Cir. 2016) ("[Plaintiff's] RFC to perform simple tasks adequately captured" even moderate mental limitations; finding that unskilled jobs listed in DOT met this standard).

Remand on this ground is thus unwarranted.

B.   The ALJ Did Not Err in Evaluating Plaintiff's

     Subjective Symptom Testimony

Plaintiff argues that the ALJ erred in rejecting his testimony about his difficulties with balance, standing, and walking. (See J. Stip. at 19-26.)  He evidently does not contend that the ALJ erred in evaluating his testimony about his alleged cognitive impairments. (See id.)  For the reasons stated below, the ALJ did not err on this ground, and even if she had, any error would have been harmless.

1.   Applicable law

An ALJ's assessment of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight." See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended) (citation omitted); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986).  "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'"  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36; see also SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  Lingenfelter, 504 F.3d at 1036 (citation omitted).  If such objective medical evidence exists, the ALJ may

not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen, 80 F.3d at 1282 (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if she makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). If evidence of malingering exists, however, the ALJ may reject the claimant's symptom testimony by stating why the testimony is "unpersuasive." Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006) (citation omitted); see also Baqoyan Sulakhyan v. Astrue, 456 F. App'x 679, 682 (9th Cir. 2011) ("When there is affirmative evidence of malingering, which is present in this case, the ALJ is relieved of the burden of providing specific, clear, and convincing reasons to discount claimant's testimony."); Schow v. Astrue, 272 F. App'x 647, 651 (9th Cir. 2008) ("[T]he weight of our cases hold that the mere existence of 'affirmative evidence suggesting' malingering vitiates the clear and convincing standard of review.").[15]

---

[15] Plaintiff appears to argue that the ALJ was required to provide "clear and convincing" reasons for discounting his testimony because the record had no "evidence of malingering." (See J. Stip. at 20); see also Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended) (absent finding or affirmative evidence of malingering, ALJ must provide "clear and convincing" reasons for rejecting claimant's testimony (citation omitted)); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014) (same). But Dr. Izzi's 2015 report provided evidence of malingering. (See AR 1313-14 (Plaintiff's results on trail-making test suggested poor effort rather than cognitive impairment).) Thus, the ALJ needed to articulate only "specific, cogent" reasons for rejecting Plaintiff's testimony,

In assessing credibility, the ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; and (4) testimony from physicians and third parties.  See Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the ALJ's assessment of the claimant's subjective symptom statements is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  Thomas, 278 F.3d at 959 (citation omitted).

    2.   Relevant background

        a.  *Consulting opinions concerning physical limitations*

On October 6, 1997, in connection with Plaintiff's 1997 SSI application, psychiatrist and neurologist Malcolm Valentine met with him for a consulting exam.  (AR 567-70.)  Dr. Valentine performed a neurological examination with mostly normal results except in the areas of "stance and gait": Plaintiff "walked somewhat stiffly[] but was not grossly ataxic"[16] and was "quite

---

see Berry, 622 F.3d at 1234 (citation omitted), which she did. In any event, the ALJ's reasons were also clear and convincing.

[16]   Ataxia is a lack of muscle control or coordination of voluntary movements and may result from damage to the cerebellum. See Ataxia, Mayo Clinic, https://www.mayoclinic.org/ diseases-conditions/ataxia/symptoms-causes/syc-20355652 (last

incapable of hopping on either foot and was unable to stand on either foot without assistance." (AR 568-69.) He diagnosed him with "chronic encephalopathy secondary to cerebral trauma" and opined that Plaintiff had "gait difficulty" and was "somewhat unstable without" using a cane but "fortunately" did "not have seizures." (AR 570.) He did not assess any limitations on Plaintiff's ability to work. (See id.)

On May 22, 2011, Dr. Rathana-Nakintara observed that Plaintiff's "posture and gait were normal" and noted "no involuntary movements." (AR 848.) On May 30, 2012, Plaintiff met with Dr. Ursula Taylor, an internal-medicine specialist, for a consulting exam. (AR 969-74.) He reported "feeling off balance[]" and falling easily and stated that he "tend[ed] to get nauseous before" seizures and would have to sit down. (AR 969.) He stated that he had had "trouble with seizures" since the 1997 assault and would have one "maybe once per month," causing him to lose consciousness or bite his tongue. (AR 970.) He also complained of "joint and back pain" and swelling and stiffness in his "shoulders, elbows, wrists, hands, hips, knees, ankles and feet." (AR 969.) Dr. Taylor nonetheless observed that he "ambulate[d] with normal gait" without an assistive device and without evidence of tremor (AR 971-72) and found "no evidence" of "deformities, swelling, or tenderness to direct palpation of any joint" or of "significant kyphosis, lordosis or noticeable scoliosis" in his spine (AR 972). She reported that he had "full range of motion" of all joints and his lumbar spine and "appeared

updated Mar. 8, 2018).

25

to have normal sensation of both fingers and toes" despite complaints of diabetic neuropathy. (AR 973.) She opined that Plaintiff could lift and carry no more than 20 pounds occasionally and 10 pounds frequently, could walk and stand six hours in an eight-hour workday, could not perform any balancing, crawling, or work at heights, and could not operate moving machinery or drive. (AR 973.)

On August 8, 2013, a medical provider whose signature is illegible checked a box on a form stating that "[b]ased on medical findings," Plaintiff was limited to sedentary work. (AR 1181.) The provider did not cite any particular diagnostic results or clinical findings in support of that opinion but noted at the bottom of the form that Plaintiff was "diabetic," had "neuropathy," and had been prescribed Dilantin[17] for convulsions. (Id.)

At his October 2, 2015 visit with Dr. Izzi, Plaintiff reported problems with balance and said that he fell easily. (AR 1311.) He also reported taking habitual walks by himself and with the family dog. (Id.) He did not report current problems with seizures. (See AR 1311-14.) Dr. Izzi observed that Plaintiff's gait was "somewhat abnormal" but that he had not used any assistive device to enter or exit the exam room. (AR 1312.) His RFC assessment did not address any physical impairments Plaintiff might have had. (See AR 1315-17.)

---

[17]    Dilantin is a brand name for phenytoin sodium, an anticonvulsant. See Dilantin, WebMD, https://www.webmd.com/drugs/2/drug-4157/dilantin-oral/details (last visited Oct. 10, 2018).

b. *Medical treatment*

Between May 1, 2012, and April 8, 2016, Plaintiff had regular visits with family practitioners at Serra medical clinic in San Fernando. (See AR 1000-60, 1187-310, 1327-51.) Those records show prescription refills for his medications for diabetes, high cholesterol, high blood pressure, epilepsy, gastric reflux, and depression and anxiety (see generally id.) and routine care, such as flu shots and treatment for conjunctivitis (see, e.g., AR 1026, 1331). He was not referred to any outside specialist or advised to seek more aggressive or intensive treatment for any of his various ailments. (See generally AR 1000-60, 1187-310, 1327-51.) None of his doctors offered any opinion as to his functional limitations in a workplace environment, such as problems with walking, standing, or balancing. (See generally id.)

c. *Self-reports and third-party report*

In April 2012, Plaintiff filled out a "seizure questionnaire" in which he claimed to have seizures "every 3 months" but listed his "last 4 seizures" as having taken place over a five-year period that ended in 2008. (AR 505.) He reported that he had been prescribed Dilantin in 2007 and that it controlled his seizures "well." (AR 506.)

On April 19, 2012, Plaintiff submitted a "Function Report - Adult" in which he reported that on a typical day, he rose around 8:30 a.m., prepared his tea, went through his "check list," had breakfast, watched TV, "clean[ed] up his room," and took two

walks, one for 30 minutes in the morning and one in the
afternoon, among other activities.[18]  (AR 484.)  He also regularly
took out trash bins and washed dishes.  (AR 486.)  He shopped for
his own groceries in grocery stores.  (AR 487.)  He attended
church twice a month.  (AR 488.)  He could walk about a mile and
a half without needing a five-minute rest and could pay attention
to "one person only" for two hours.  (AR 489.)

Plaintiff complained, however, that putting on pants and
shoes was "difficult," he could not iron his own clothes, and he
had fallen in the bathtub "more than once."  (AR 485.)  He
claimed that the head injuries he suffered in 1997 affected his
ability to lift, squat, bend, stand, reach, walk, sit, kneel,
talk, climb stairs, remember things, complete tasks, concentrate,
understand or follow instructions, and use his hands.  (AR 489.)
He had been given a cane by a "therap[i]st" around 2010 and used
it "when [it] is cold or when I fall down."  (AR 490.)

On May 5, 2012, Plaintiff's friend Sandra Mata completed a
third-party Adult Function Report.  (AR 496-503.)  She stated
that she saw Plaintiff once or twice a week and they would "walk"
and "talk."  (AR 496.)  She reported that Plaintiff's daily
activities included brushing his teeth, showering, eating
breakfast, and taking a morning walk.  (Id.)  She noted that he
had fallen while bathing and when walking because he didn't "feel
his feet."  (AR 497.)  She stated that Plaintiff prepared his own

---

[18]    The report was apparently completed by a nonattorney
(AR 491) whom Plaintiff appointed as his representative in March
2012 (see AR 194).

meals and made his bed daily, and he folded his own clothes "x2 days." (AR 498.) He did his own grocery shopping every week, "accompanied by someone." (AR 499.) He went "out on the yard . . . daily" but went "[o]ut to the street" "only" when he had a doctor's appointment because he was afraid he would get dizzy and lose his balance. (Id.) Although he was sometimes "disoriented," he did crossword puzzles, played cards, and watched TV "daily" and performed "very well." (AR 500.) He and Mata went for walks for ice cream once or twice a week, and he regularly went to church and "for walks." (Id.)

Mata indicated that Plaintiff's conditions affected his ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, remember things, complete tasks, concentrate, understand and follow instructions, and get along with others. (AR 501.) She opined that he could "maybe" lift five pounds, "never" kneel, could not walk or stand for "to[o] long," and lost balance when climbing stairs. (Id.) She felt that he could walk for half a mile, "if anything," without needing to rest and would have to rest for 20 minutes before he could resume walking. (Id.) He could pay attention for only "30 min[ute]s." (Id.) He did not follow spoken or written instructions well. (Id.) Mata was under the impression that Plaintiff had been prescribed a cane by a doctor in 1997 and needed to use it "when walking." (AR 502.)

### d. *Plaintiff's testimony*

At the September 2015 hearing, Plaintiff admitted that he could speak English and had done some college-level work in his

home country (AR 68-69) but "would prefer" to answer questions in Spanish (AR 74).[19] He testified that he could "not walk well" and couldn't "stand" or "sit" for a "long time," apparently meaning for longer than 10 minutes. (AR 70.) He complained that he was "unbalanced" but attributed his difficulties with standing, walking, and climbing stairs to what appeared to be diabetes-related fatigue, "pain" "from the waist down," and numbness in his feet, not to any balance issues. (AR 71.) He complained that he could not "walk straight," and his ankle would go "wobbly," causing him to "trip over" or "fall down" three to four times a month. (AR 72.) He did not mention having suffered any injury from those falls. (See generally AR 70-77.) He admitted that his medications had "really helped" his seizures (AR 75) and denied having had seizures "lately" (AR 74). He cooked for himself, washed his own clothes, and cleaned his room on his own but sometimes had help from his father or sister. (AR 75.) He paid rent "with services," apparently referring to state or county benefits of some kind. (AR 76.) He did not have any friends because it was "too much for [his] brain to figure friends." (Id.)

        3.  Analysis

    Plaintiff argues that the ALJ improperly rejected his testimony on his limitations in balance, walking, and standing

_____

        [19]  A Spanish-language interpreter was present at the hearings (see AR 36, 48) but the extent to which her services were used at the September 2 hearing is not clear (see generally AR 68-77).

because she "isolate[d] portions of the record" (J. Stip at 22)
rather than considering it as a whole and because she was biased
against him (id. at 23-25; see generally id. at 19-26).  For the
reasons discussed below, that argument is unfounded and thus
provides no basis for finding error.

### a. *Inconsistency with the medical record* and *conservative treatment*

The ALJ discredited Plaintiff's subjective symptom testimony
in part because it was inconsistent with the medical record as a
whole, including his "routine" "overall treatment history."  (AR
23.)  She specifically cited Dr. Taylor's findings that he had
normal sensation in his fingers and toes (see AR 22 (citing AR
973 (also finding normal range of motion in his limbs and
spine))) and findings from Plaintiff's own doctor that his
diabetes was "without complication[s]" (see AR 22 (citing AR
1035)).  Dr. Rathana-Nakintara in 2011 (AR 848-52) and Dr. Izzi
in 2015 (AR 1311-14) did not observe Plaintiff falling or having
trouble with balance; only Dr. Izzi noted a "somewhat abnormal"
gait, which did not require use of an assistive device (AR 1312).

Plaintiff's records from the Serra medical clinic, spanning
February 2007 to May 2016 (see AR 879-966, 1000-60, 1187-310,
1327-51), which the ALJ also cited (see AR 22), show routine care
without complications or deterioration causing any of his claimed
symptoms.  He admitted that his seizures and depression were
controlled with medication.  (See, e.g., AR 74, 506); Warre v.
Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006)
("Impairments that can be controlled effectively with medication
are not disabling for the purpose of determining eligibility for

SSI benefits.").

In sum, Plaintiff points to no evidence in the record that
problems with balance and gait were as severe as he claims, and
none is apparent to the Court.  The ALJ evaluated the medical
record appropriately and properly considered it as a factor in
weighing his credibility.  Cf. Reddick, 157 F.3d at 722-23
(reversal warranted when ALJ inaccurately characterized record
and did not fully account for context of materials or all parts
of testimony and reports).

b.  *Activities of daily living*

The ALJ also discounted Plaintiff's subjective symptom
testimony because his activities of daily living were
inconsistent with the alleged degree of his symptoms.  (AR 23-
24.)  He admitted in his function report that he prepared his own
meals, did his own grocery shopping, cleaned and did household
chores, attended church twice a month, and took frequent walks of
up to a mile and a half at a time.  (AR 484-89.)  His friend
Sandra Mata confirmed that information and added that he did
crossword puzzles and socialized with her about twice a week.
(AR 496-500.)  By all doctors' accounts he could capably handle
his own finances.  (See, e.g., AR 851, 980, 1314.)  Those are
mostly normal activities of daily living that undermine his
allegations of disability.  See Morgan v. Comm'r of Soc. Sec.
Admin, 169 F.3d 595, 600 (9th Cir. 1999) (plaintiff's ability to
fix meals, do laundry and yard work, and occasionally care for
friend's child was evidence of ability to work); Curry v.
Sullivan, 925 F.2d 1127, 1130 (9th Cir. 1990) (plaintiff's
ability to take care of her personal needs, prepare easy meals,

do light housework, and shop for groceries inconsistent with claim that ailments precluded her from working). There was thus no error on this ground, either.

### c. *Bias*

Plaintiff argues that the ALJ who presided over his two most recent hearings was biased against him based on her interactions with his attorney during cross-examination of the vocational expert at the first hearing, her delay in holding the second hearing, and her statement that she was "not bound by case law." (See J. Stip. at 23-25; see also AR 44, 78, 80.) "ALJs and other similar quasi-judicial administrative officers are presumed to be unbiased," a presumption that "can be rebutted by a showing of conflict of interest or some other specific reason for disqualification." Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999) (citation omitted). Expressions of sarcasm, impatience, dissatisfaction, annoyance, or even anger do not establish bias. See Liteky v. United States, 510 U.S. 540, 555-56 (1994); Rollins v. Massanari, 261 F.3d 853, 858 (9th Cir. 2001). Rather, a plaintiff claiming bias must show that "the ALJ's behavior, in the context of the whole case, was so extreme as to display clear inability to render fair judgment." Rollins, 261 F.3d at 858 (citation omitted).

Plaintiff has not made that showing here. The interaction between the ALJ and his attorney on cross-examining the VE shows impatience at most, and Plaintiff nowhere explains how the resulting disability determination would have been different had his attorney been able to pose the desired hypothetical. (Moreover, the ALJ also responded with some annoyance and sarcasm

to impartial medical expert Gordy's request for more tests (see AR 67), suggesting that her salty manner arose from factors unrelated to any bias against Plaintiff.)  As to the ALJ's statement that "we are not bound by case law" (AR 44), Plaintiff's attorney responded, "[t]hat is fine" (id.), and Plaintiff has pointed to no case law that he contends would have changed the outcome had the ALJ followed it, nor is any apparent to the Court.  Further, the ALJ perhaps recognized that she had been a bit peremptory with counsel because on the very next page of the transcript she "thank[ed] her" for "pointing [the law] out" and said, "it's always good to check."  (AR 45.)  Finally, as to the delay in holding the second hearing, Plaintiff does not contend that it resulted from bias against him — to the contrary, he concedes that the ALJ's stated reason was that she was running behind on her cases, and nothing in the record suggests that that explanation was inaccurate or pretextual.  As such, Plaintiff's bias argument is without merit.  Rollins, 261 F.3d at 858 (citation omitted).

## VI.    CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[20] IT IS ORDERED that judgment be entered

---

[20]    That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.

DATED: October 15, 2018

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge